Scott, J.
delivered the opinion of the Court.
' On the first question, it is contended :
1st. That in a case where the prosecution had not only been commenced, but so far proceeded in that a venire facias had been issued and a jury summoned, under the provisions of the law as it then stood, that venire facias could not be abandoned, and a new one issued, and a new jury summoned under the new law, consistently with the terms of the new law.
2d. If the terms of the new law left it doubtful whether such a proceeding is authorized or no, (which it was contended the law in question did at the least,) as the presumption is against an intention on the part of the Legislature to enact a retrospective law, the Court should construe it prospectively.
• ’3d. If the terms of the act in question embraced of-fences previously committed, it is pro tanto, ex post facto, within the meaning of the Constitution, and void; because it lessens the privileges of the accused by a change made not only after the offence had been committed, but after the prosecution had been commenced.
The words of the law are, “ that hereafter in all prosecutions for murder, treason, or any offence punishable by death or confinement in the public jail and penitentiary house, the venire facias shall command the sheriff or other officer, charged with its execution, to summon twenty-four good and lawful men,” &c.
*635 The word “ hereafter,” as here used, is synonymous with the word “henceforth.” It is equivalent to the phrase “from and after the passage of this act.” It speaks of the time when the law shall take effect; not of the cases to which it shall be applied. That time was instant. It operated immediately on all cases within its scope. What are those cases? “Prosecutions for offences punishable by death or confinement in the penitentiary.” Such prosecutions might be either then pending, or thereafter commenced. Does the law confine its operation to one, or embrace both ? The words of the law answer the question. They declare that't-he new proceeding which it introduces shall be applied to all prosecutions for the offences specified.
By no possible arrangement or transposition of the words, can it be confined to offences thereafter committed. There is not a syllable which speaks of the time when the offence is committed. Nothing is said concerning the offence but its grade. It must be punishable with death or confinement in the penitentiary; and whenever so punishable, the offender is to be tried in the mode prescribed. When, therefore, the law by its terms confessedly embraces offences theretofore committed, why should we suppose that the Legislature paid so much regard to the minor, nay immaterial consideration of the then pendency or subsequent commencement of the prosecution of the offender?
If the act embraces pending prosecutions, does the fact that the clerk of the County Court had issued a venire facias before its passage, form an exception ?
Such a construction, would make the application of the law to a given case depend on the greater or less diligence of the clerk of the County Court; or the longer or shorter time that had elapsed between the commencement of the prosecution, and the passage of the act; or the progress which had been made in it. No such exceptions are found in the statute; on the con *636 trary, its provisions embrace all prosecutions for the specified offences.
Again. It declares that in all such prosecutions the venire facias shall command the sheriff, &c. More comprehensive words could not be employed. It is not said that the clerk shall issue, or the Court award the process, but that the process, whensoever or by whatsoever authority issued, shall be of the required description.
A venire facias is the process by which the jury for the trial of the accused is summoned. The law, therefore, in effect declares, that in all prosecutions for the specified offences, the process by which the jury for the trial of the accused is summoned, shall be such as is therein described. Whilst this is the law of the case, can any other valid venire facias be issued de novo, or continue in existence if previously issued ?
If the act in question applies to existing prosecutions, it repeals all former laws authorizing a different process. And when the law under which a process has been issued is repealed, can the process continue to exist ? Shall a process issued under a repealed law take precedence of process issued under the repealing law ? We are of opinion that the effect of the repealing law was to annul the first venire facias ; and when that was put out of the way the case stood as if it never had existed, and the clerk properly issued another.
Is the statute, when so construed, in conflict with the Constitution ? The technical words “ ex post factof used in the Constitution, relate to crimes and punishments ; and not to criminal proceedings. They forbid the passage of any law which makes an action criminal, which was lawful when it was performed. And not only laws which come directly within this definition, but such as inflict an existing punishment, which the, accused would otherwise escape, are forbidden. The farthest that any of the authorities cited in the argument haye carried this enlarged construction of the inhibition, *637 is where the rules of evidence are changed. No exam-pies were given, but examples may readily be conceived: as a change in the law of treason, which would make one witness to an overt act sufficient. If on a trial for treason, but one witness to an overt act were produced, as the law now stands, the accused would be acquitted. If the supposed change were made, he would be convicted. So, if a man’s wife were allowed to be a witness against him. But no authority has been produced which establishes that a change in the forum, or mode of trial, violates the provision. Lessening the number of challenges, may or may not produce a conviction. It may lessen the chances of a favourable jury; but the jury, however formed, must decide the case upon the same law and the same evidence. The Bill of Rights requires that every man accused of crime shall be tried by an impartial jury; and without going in detail into the provisions of the act in question, we venture to say that it is eminently calculated to carry out this salutary provision.
It doubtless lessens the chances of impunity for guilt, but no innocent man is jeopardized. The means of packing a jury are lessened by substituting substantial freeholders, summoned from remote parts of the county, for bystanders. But no new crime is created; no new rule of evidence introduced. The change is strictly in the lex fori. We think it a salutary law which works well in practice; and not a violation of the Constitution when applied to offences committed before its passage.
Did the Court err in permitting the witness to be examined ? Much time was employed, and much learning and ingenuity displayed by counsel in tracing and explaining the origin, nature and extent of the rule of the common law, which requires testimony to be given under the sanction of an oath; the nature and purposes of oaths, and the necessity of a belief in rewards and punishments at the hands of the Deity, either in this *638 world of the world to come, for our good or evil actions in this life.
The opinions and practice of all civilized nations, of which we have any account, place great value on the obligation of an oath.
It is justly supposed, that all who acknowledge an overruling and just God, whether they believe in a future state or no, believe that they incur a higher obligation, when they invoke Him to witness their vows, or the truth of what they declare, than by a simple promise or asseveration; and that He will visit the sin of perjury with a higher punishment than any other falsehood, or the violation of a promise or duty not enforced by that high and solemn sanction. And as those who reject the being of a God, or deny Him the attribute of justice, must be few, if, indeed, it be possible for any civilized and rational mind so to think, the common law in its search after truth, carefully employing every meiins of obtaining it, does not neglect one supposed to be, so efficacious; and therefore requires that all who are examined as witnesses in a Court of Justice shall take.an oath to tell the truth^/’An anomalous exception at one time existed in the case of the witnesses for the accused on a trial for crime; and more recently, another exception has been introduced both in England and Virginia, in favour of those who construe the command “ Swear not at all,” to forbid all oaths. They are admitted to testify upon a mere promise to tell the truth. \
y/But' the common law did not stop here. It trod^ upon more delicate ground, and instituted a scrutiny into the religious opinions of the witness. This' was according to 'the spirit of the age in which the rule was introduced. England was a Christian country. The Christian Revelation declared all other religions to be false and impious. To its followers, to use the words of an eminent Christian Divine, “it would have ap *639 peared a symptom of diffidence in the goodness of their cause, or an acknowledgment that it was not well founded, if they had not employed in its defence all those means which it was supposed truth had a right to employ.” Robertson's Charles Fifth, vol. 3d, p. 257. Accordingly, the Christian religion was declared to be a part of the common lawy “ Speculative opinions were propagated and defended by force; the charity and mutual forbearance which Christianity recommends with so much warmth were forgotten ; the sacred rights of conscience and private judgment were unheard of; and not only the idea of toleration, but even the word itself, in the sense now affixed to it, was unknown.' A right to extirpate error by force was universally allowed to be the prerogative of such as possessed the knowledge of the truth; and as each party of Christians believed that' they had got possession of this valuable attainment, they all claimed and exercised, as far as they were able, th'e rights which it was supposed to convey.” Id. Ib.*
*640 It was under the influence of these opinions, and in this spirit, that, as late as the time of Lord Coke, and probably long afterwards, it was held that one who did not believe in the Christian religion could not be a witness. An Infidel is classed by that writer with persons , who are infamous and have lost liberam legem. 1 Inst, fo. 6 b;.*
*641 The progress of science and civilization, and the demands of commerce, have led to a relaxation of the rule ; but it still retains a portion of its intolerant spirit; and the Courts of Justice in England, and in some of our sister States, have exercised an inquisitorial power over the religious belief of witnesses. In some of the States it has been relaxed or annulled by statutory and constitutional provisions. In Virginia, it was wholly abrogated by our Bill of Rights, and the act for securing religious freedom* subsequently engrafted in the amended Constitution,.which wholly and permanently separated “religion, or the duty which we owe to our Creator,” from our political and civil governmentputting all religions on a footing of perfect equality; protecting all; imposing neither burdens nor civil incapacities upon any; conferring privileges upon none. Declaring, on the one hand, that “ no man or set of men are entitled to separate or exclusive privileges and emoluments from the community but in consideration of public services;” and on the other, that “ no person shall be enforced or otherwise restrained, molested or burdened in his body or goods, or otherwise suffer on account of his-religious opinions and belief: but all men shall be free to profess, and by argument maintain their opinions in matters of religion ; and the same shall in no wise affect, diminish, or enlarge their civil capacities.”—“That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, and not by force and violence.” Placing the Christian religion where it stood in the days of its purity, before its alliance with the civil magistrate ; when its votaries employed for its *642 advancement no methods blit such as are congenial to y* its nature!; when, to use the language of the eloquent Divine already quoted, its advocates, “By the force of powerful arguments convinced the understandings of men; and by the charms of superior virtue captivated their hearts.”]] Proclaiming to all our citizens that henceforth their religious thoughts and conversation shall be as free as the air they breathe; that the law is of no sect in religion; has no high priest but justice. Declaring to the Christian and the Mahometan, the Jew and the Gentile, the Epicurean and the Platonist, (if any such there be amongst us,) that so long as they keep within its pale, all are equally objects of its protection ; securing safety to the people, safety to the government, safety to religion; and (leaving reason free to combat error) securing purity of faith and practice far more effectually than by clothing the ministers of religion with exclusive temporal privileges; and exposing them to the corrupting influence of wealth and power. ■ » .
What shall we gain by establishing the inquisition insisted on by the learned counsel for the prisoner?
Suppose a witness to be the worst of Infidels. Tell him that the law ranks him with those whom it holds infamous; that rif he dares avow his opinions, he will be rejected from the witness stand, and run' the risk of being hissed out of Court, as has happened in modern times in an English Court of Justice, and you. add hypocrisy to infidelity. Push the iuquisition to the extent of putting him to the question on his voir dire. If, as the objection supposes, he is incapable of telling the truth, he will deny his opinions, and what is the test worth ?
If he is honest enough to subject himself to the disability, rather than tell a lie, why exclude him ?
y^It is asked, if we indulge this entire freedom of opinion in matters of religion, why administer the oath? Why demand this security from one whom it does not bind ?
*643 The question is answered by asking another. If it binds ninety-nine in the hundred, shall we refuse it from the ninety and nine because it does not bind the remaining one of the hundred? We require the oath of the juryman, the Judge, and the executive magistrate. As to them it has no temporal sanction; yet we subject them to no religious test. The witness who swears falsely incurs the pains and penalties of perjury. The juryman who finds a false verdict goes free; and the corrupt magistrate suffers no greater punishment, because he has violated his oath, in violating his duty. There is quite as much reason for dispensing with the oath as to these, as there is for dispensing with it in the case of the Avitness, We administer it to them all, in the hope and expectation that far the greater part, if not all, acknowledge and feel its religious obligation.
The enforcement of the high test contended for by the prisoner’s counsel, of a belief in future rewards and punishments, might present the spectacle of a Christian man found guilty by an Infidel jury, sentenced by an unbelieving Judge, and denied mercy by an Atheist governor ; and all because of the rejection of .a Christian witness; for all Christians do not believe in future punishments!
The Constitution declares, that all men shall be free to profess, and by argument to maintain their religious opinions. Is the man who is stigmatised by the law as unworthy of belief; one who, in the language of Lord Coke, is in the condition of those who have lost “ liberara legem,” because of his opinions, as free to avow and defend those opinions as one who can fearlessly enter a Court of Justice, and offer his testimony to protect the property, the reputation or the life of his neighbour ?
It was said that one Avho holds the proscribed opinions, has not the “capacity” to testify. To what class does this incapacity belong ? Not to that to which we refer, that of the infant and the idiot. It is not a natural *644 incapacity. If not from nature, whence is it derived ? From the law. From the civil institutions of the country. It is, then, a civil incapacity. But the Constitution says that religious opinions shall not lessen “ civil capacities.”.
It was argued that when a man is rejected as a witness between other parties, no right of his is invaded. He suffers neither wrong nor damage by the rejection. He may make an affidavit in a caftse in which he is party; swear to a bill or answer in chancery; require surety of the peace; make complaint before a justice of peace, and even give evidence of an assault and battery on himself. All this the most infamous may do. But when he is rejected as a witness in other cases, he has nothing to complain of. Is this so ?
Every citizen is interested in the due enforcement of the law, and administration of justice between man and man. If one who invades the rights of his neighbour, is compelled to make amends, it not only tends to prevent a repetition of the wrong by him, but deters others; and so far protects the persons and property of all. Every citizen has an equal right to bring offenders against the criminal laws to justice; and may assume the office of prosecutor on an indictment or information for a misdemeanor. The privileged informer may procure a conviction on his own evidence, whilst the proscribed is sent out of Court with the costs upon his back.
The proscribed, man may suffer in his property, or in the persons of the members of his family. His goods may be stolen, his dwelling broken into by the midnight robber, or burned by the incendiary; his child may be beaten, or his wife murdered before his face, and the offender escape because of the incapacity of the injured man to give evidence against him. This very incapacity may have caused the calamity: and can he be told that he lives under a government of equal laws ? That he has suffered nothing on account of his opinions? ?
*645 The only error which the Court below committed, J . ... was in allowing the witness to be questioned on his voir dire touching his religious opinions. This being an error in favour of the prisouer, the judgment must be affirmed.
Judgment affirmed.

 Note In) the Judge.—“ Oar histories have not, I believe, stated what is untrue of Queen Mary; nor, perhaps, have they very much exaggerated what is true of her; but our arguers, whose only talk is of Smithfield, are generally very uncandid in what they conceal. It would appear to be little known that the statutes which enabled Mary to burn those who had conformed to the church of her father and brother, were Protestant statutes, declaring the common law against heresy; and framed by her father, Henry the Eighth, and confirmed and acted upon by order of council of her brother, Edward the Sixth; enabling that mild and temperate young Sovereign to burn'divers misbelievers by sentence of commissioners, (little better, says Neale, than Protestant inquisitors,) appointed to ‘ examine and search, after all Anabaptists, Heretics, or contemners of the hook of Common Prayer.' It would appear to be seldom considered that her zeal might very possibly have been warmed by the circumstance of both her chaplains having been imprisoned for their religion, and herself arbitrarily detained, and her safety threatened, during the short but persecuting reign of her brother. The sad evidence of the violence of those days are by no means confined to her acts. The faggots of persecution were not kindled by the Papists only, nor did they cease to blaze when the power of using them as instruments of conversion ceased to be in Popish hands. *640 (Meaning .the reign of Elizabeth.) Crammer, himself, in his dreadful death, met with but equal measure for the flames to which he had doomed several who denied the spiritual supremacy of Henry the Eighth; to which he doomed also a Dutch Arian, in Edward the Sixties reign; and to which he had with great pains and difficulty, persuaded that Prince to doom another miserable enthusiast, Joan Bochar.,'for some metaphysical notions of her own on the Divine incarnation. ‘ So that on both sides, (says Lord Herbert of Cherbury,) it grew a bloody time.’ Calvin burned Servetus at Geneva, for ‘ discoursing concerning the Trinity, contrary to the sense of the whole church; and thereupon set forth a book loherein he giveth an account of his doctrine, and of whatever else had passed in this affair, and teacheth that the sivord may be lawfully employed against Heretics.’ In later ■times, thousands of Protestant Dissenters, of the four great sects, were made to languish in loathsome prisons, and hundreds to perish miserably, during the reign of Charles the Second, under a Protestant High Church government, who then first applied, in the prayer for the Parliament, the epithets of ‘ Most Religious and Gracious,’ to a 'Sovereign whom they knew to be profligate and unprincipled beyond example, and had reason to suspect to be a concealed Papist.” Lord Nugent’s Letter to Sir George Lee; Sidney Smith’s Miscellanies, vol. 2, p. 204.
Before the passage of our act of toleration, it was no uncommon thing in Virginia for a Baptist minister to preach to his followers through the grates of a prison.

 Note by the Judge.—The opinion of Lord Coke has been much censured, and denied to be law. A very little' reflection upon the history of the times in which he wrote, and those which preceded it, will be sufficient to satisfy the candid enquirer that the censure, however well deserved by the rule which he lays down, cannot with justice be applied to the writer. Without going farther back than the reign of Elizabeth, with whom Lord Coke was contemporary, we shall find abundant evidence of an intolerant spirit, harsh enough and sufficiently relentless, to have enforced such a rule. When she ascended the throne, she fourid the Romish religion the religion of *641 the State, and of a very large portion of her subjects. The transition from Romanism to Protestantism, was sudden and violent; and the acts of her reign sufficiently shew that .Christianity had gained but little of that milk of human kindness which characterised its early professors, by the change.